Filed 9/23/13  Wasserman, Comden, Casselman & Esensten, LLP v. Patel CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| WASSERMAN, COMDEN, CASSELMAN & ESENSTEN, LLP,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>RAKESH PATEL et al.,<br><br>Defendants and Appellants. | B243613<br><br>(Los Angeles County<br>Super. Ct. No. LS022131) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Huey P. Cotton, Judge.  Affirmed.

Snell & Wilmer, Richard A. Derevan, and Todd E. Lundell, for Defendants and Appellants.

Esner, Chang & Boyer, Stuart B. Esner; Wasserman, Comden, Casselman & Esensten, David B. Casselman; Law Offices of Peter Q. Ezzell and Peter Q. Ezzell for Defendant and Respondent.

_____

Rakesh (Ray) Patel, Thakor I. Patel and Kusum T. Patel appeal from the judgment confirming an arbitration award resolving an attorney fee dispute in favor of the Patels' former counsel Wasserman, Comden, Casselman & Esensten LLP (WCCE). The Patels contend the award of approximately $4.8 million, plus attorney fees and costs of another $200,000, should have been vacated because (1) the arbitrators failed to disclose their service as neutrals in cases involving the law firm with which counsel for WCCE was associated as "of counsel" in violation of Code of Civil Procedure section 1281.9 and the California Rules of Court, Ethics Standards for Neutral Arbitrators in Contractual Arbitration, and (2) the arbitrators exceeded their powers by issuing an award that violates the public policy set forth in rule 3-300 of the Rules of Professional Conduct. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Litigation Concerning The Americana at Brand and the Contingency Fee Agreement Between the Patels and WCCE*

Ray Patel was part owner and general manager of the 55-room Golden Key Hotel in Glendale. Thakor I. Patel and Kusum T. Patel, Ray Patel's parents, are the trustees of the Patel Family Trust, which was also part owner of the hotel. The Patels acquired the hotel in 2002 for approximately $5.2 million.

In May 2008 the Patels retained WCCE to represent them on a contingency fee basis in connection with claims against the Glendale Redevelopment Agency, the City of Glendale, Caruso Affiliated Holdings, LLC and The Americana at Brand, LLC (the successor-in-interest to Caruso Affiliated Holdings) arising out of the construction and operation of the multi-million dollar shopping center and residential development known as The Americana at Brand, which opened May 2, 2008.[1] The Golden Key Hotel was immediately adjacent to, and effectively surrounded by, The Americana at Brand and was

---

[1] The Patels had previously contacted several other law firms, all of which declined to represent them on a contingency fee basis.

one of only two buildings in the "footprint" of the project that was not demolished during the initial construction phases.

As reflected in the complaint filed by WCCE in July 2008 for inverse condemnation, breach of contract, nuisance, negligence and trespass (*Patel v. Glendale Redevelopment Agency* (Super. Ct. L.A. County, 2008, No. BC395089)), the Patels contended their "comparatively modest hotel business has suffered years of continuous physical and business interference and damage. A combination of construction traffic, trash loading, congestion, noise, dust, fumes, blocked access, banging and other generally offensive and abnormal conditions starting early in the mornings and extending until late into the night, have proven to be highly detrimental to their business, use and enjoyment of their property." Alleging The Americana at Brand was planned, approved, constructed and developed by the Glendale Redevelopment Agency (GRA) with the substantial participation of the City of Glendale as part of an effort to eliminate blight and keep downtown Glendale economically viable, the Patels asserted the public entity defendants were liable under a theory of inverse condemnation for the hotel's "diminution in value, loss of revenue, loss of goodwill, property damage, increased operating costs, attorneys fees, and other losses and costs in a sum . . . expected to exceed $10 million." The complaint also alleged Caruso Affiliated Holdings breached a written contract to relocate trash collection and disposal facilities at the construction site, Caruso Affiliated Holdings and The Americana at Brand were liable for trespass and negligence, and all defendants were responsible for the Patels' damages for maintaining a nuisance.

The written contingency fee agreement between the Patels and WCCE identified the subject matter of the representation as "a claim for damages or other appropriate relief against whomever is responsible for the injury or loss suffered by Client [(defined as the Patel Family Trust and Ray Patel)] arising out of the following incident or transaction: the construction and operation of the Glendale Town Center Project (Americana at Brand) in Glendale, California, including conduct of Caruso Affiliated, LLC, The Americana at Brand, LLC, the City of Glendale Redevelopment Agency, and the City of

3

Glendale." The fee agreement recited the Patels had agreed "the following fee arrangement is fair and reasonable, and to pay Attorney the following amount: [¶] If the matter is settled at any time before the case is first assigned a trial date, an amount equal to thirty three and one-third percent (33 1/3%) of any recovery obtained. [¶] Thereafter, an amount equal to forty percent (40%) of any recovery, whether by way of settlement, judgment or compromise." The agreement, which contemplated the possible recovery of attorney fees under Code of Civil Procedure section 1036 (inverse condemnation proceedings), specifically provided "[a]ttorney's fee shall be computed based on the gross recovery." Thus, costs and expenses advanced by WCCE in connection with the litigation were to be reimbursed after the contingency fee was computed.

The Patels granted WCCE an attorney's lien—what is sometimes referred to as a charging lien—to secure payment of all sums due under the fee agreement "on Client's claim and any cause of action or lawsuit filed thereon, and to any recovery Client may obtain . . . ." Any disputes regarding fees or services were to be resolved by binding arbitration.[2]

2. *The Sale of the Golden Key Hotel*

At the outset of WCCE's representation, Ray Patel told David B. Casselman, the partner in charge of the matter, he did not want to sell the hotel. Nonetheless, in November 2010, while the Patels' hard-fought litigation over The Americana at Brand was slowly proceeding toward trial, the City of Glendale and the GRA notified Ray Patel they were considering taking the hotel through eminent domain and transferring it to Rick Caruso's company to expand The Americana at Brand (apparently to provide space for a Nordstrom as an additional anchor tenant). At a city hearing to consider the issue, Caruso confirmed his interest in acquiring the hotel; and Ray Patel, in turn, indicated he was willing to sell the hotel at an appropriate price, but not "with a gun to his head." A further hearing was scheduled for February 15, 2011.

---

[2] Prior to executing the written fee agreement, Ray Patel consulted with independent counsel. WCCE made several changes to the agreement in response to Patel's requests.

4

On December 20, 2010 Caruso extended an offer to purchase the hotel for $6 million. (A 2010 appraisal Caruso provided with his offer valued the property at $4.9 million, slightly less than the amount the Patels had paid to purchase the hotel in 2002.)[3] Patel consulted with Casselman and then rejected the offer, which he described as "woefully inadequate."

Separately from the inverse condemnation/nuisance litigation, Ray Patel had begun working with Michael Hall of Patriot Capital Group, Inc. and other experts to prepare plans to upgrade the Golden Key Hotel as an alternative, competing proposal for the property to present to the City of Glendale. In February 2011 the Patels retained Joseph E. Thomas and Michael D. Martello of the Thomas Whitelaw law firm (on an hourly basis) to defend against any effort by the City of Glendale and the GRA to condemn the hotel and to assist Hall in preparing their competing plans for the hotel property. In negotiating his retention of the Thomas Whitelaw firm, Ray Patel forwarded the WCCE fee agreement and a copy of the inverse condemnation/nuisance complaint with the following directive: "I definitely do not want any financial gains from the eminent domain issue spilling over [to the] existing lawsuit."

Communications concerning acquisition of the hotel continued between Caruso and the Patel team. In a February 12, 2011 email to Hall, which was shared with Thomas and Ray Patel, but not WCCE, Caruso offered to purchase the hotel for $12.75 million. On February 14, 2011 another offer (this time directed to Thomas) was made, which included $15 million cash for the hotel property and resolution of the inverse condemnation/nuisance action, with a 10 1/2 month leaseback of the hotel (that is, through December 31, 2011) to the Patels for $1, and payment of legal fees to WCCE and Thomas's firm of $650,00-$700,000 (a package that Thomas valued at close to $17 million). Again, neither the fact that negotiations were ongoing nor the details of the offer were shared with WCCE.

---

[3] An appraisal commissioned by WCCE during the litigation valued the hotel at $3.9 million.

5

Discussions for the sale of the hotel continued into the night on February 14, 2012 and through the morning of February 15, 2011, the scheduled date for the city council meeting to hear Ray Patel and Thomas present their plan for redevelopment of the property to compete with the proposal submitted by the Caruso entities (and approved by the council staff). Ultimately, on that day Caruso agreed to purchase the hotel for $16.25 million, separately to pay $500,000 to settle the inverse condemnation/nuisance action and to lease back the hotel to the Patels through December 31, 2011 for $1. The final agreement included the following provision, "The parties will agree to be silent on the allocation of purchase price above and agree not to refute each party's respective allocation. The Purchase Price is in consideration for the Property and for the settlement of the Litigation."

Casselman first learned of the negotiations on the morning of February 15, 2011 when Thomas called him and said Caruso was interested in talking about settlement. Thomas would not provide Casselman with any details and, in fact, observed the discussions were "probably not going to amount to much." Casselman asked Thomas to have Patel call him and urged Thomas to be sure, if Patel decided to settle the inverse condemnation case, he invoked his statutory right to fees and costs under Code of Civil Procedure section 1036. When Casselman spoke to Patel that morning, according to Casselman, Patel claimed to know nothing about the settlement discussions.[4] Casselman's emails to Patel over the course of February 15, 2011 asking for information went unanswered until after 11 p.m., when Patel advised him he had settled the case for $500,000.

3. *The Fee Dispute*

When Thomas first told Casselman about the settlement discussions on February 15, 2011, Thomas asked how much WCCE had invested in the case.

---

[4] The arbitration panel expressly found Patel's contrary testimony—that he told Casselman he was settling the inverse condemnation action when he spoke to him that morning—was not credible.

Casselman responded that the time value of the work done on behalf of the Patels was $920,000, but advised Thomas the firm had a contingency fee agreement that Casselman expected to be honored.

Patel came to the WCCE offices on February 16, 2011 and again reported the inverse condemnation litigation had been settled for $500,000. He refused to disclose any other details of the purchase price or final term sheet signed by the parties. The Patels tendered $200,000 to WCCE, 40 percent of $500,000, contending that was the full amount of the fee owed to WCCE. The Patels claimed the contingency fee was never intended to cover a sale of their property.

WCCE, on the other hand, asserted the "gross recovery" on the Patels' claims subject to the retainer agreement was $17.75 million: $500,000 plus the full $16.25 million allocated to the purchase price of the hotel, plus the $1 million valuation given to the $1 one-year lease-back of the property.

4. *The Arbitration*

Pursuant to the terms of the written fee agreement WCCE and the Patels submitted the dispute to Alternative Dispute Resolution Services, Inc. (ADR Services) for arbitration. Apparently at the request of counsel for the Patels, it was agreed to use a panel of three arbitrators, rather than a single arbitrator. Retired Los Angeles Superior Court Judge Enrique Romero was the Patels' selected panel member; retired Los Angeles Superior Court Judge Joe W. Hilberman was WCCE's selected panel member.[5] Retired Los Angeles Superior Court Judge Patricia L. Collins was selected by Judges Romero and Hilberman as the third panel member and served as the presiding arbitrator.[6]

[5]      Pursuant to their agreement regarding the method for selection of arbitrators, the Patels proposed either Judge Romero or retired San Francisco Superior Court Judge Alfred Chiantelli; WCCE "deselected" Judge Chiantelli. WCCE proposed either Judge Hilberman or retired Los Angeles Superior Court Judge Robert Letteau; the Patels "deselected" Judge Letteau.

[6]      Although not fully described in the record on appeal, it appears that Judges Romero and Hilberman jointly selected three potential candidates to serve as the final

7

The complaint for attorney fees and breach of contract submitted to ADR by WCCE showed as its counsel Peter Q. Ezzell of the Law Offices of Peter Q. Ezzell APC and David B. Casselman of WCCE. William Gwire of the Gwire Law Offices appeared on behalf the Patels. In a letter dated July 27, 2011 ADR Services sent to Ezzell, Casselman and Gwire fully executed disclosure statements for Judges Collins, Hilberman and Romero. The arbitrators disclosures were limited to prior arbitrations, mediations and discovery references for individual attorneys Gwire, Ezzell, Casselman and Katherine A. Winder, an associate of Casselman's; for law firms Gwire Law Offices, Law Offices of Peter Q. Ezzell and WCCE; and for the Patels, their family trust and the Golden Key Hotel. Each arbitrator also indicated he or she would continue to entertain offers of employment as neutrals from the parties, the lawyers and their law firms during the pendency of the arbitration proceedings.

The arbitration hearing took place over five days, February 6-10, 2012. On March 22, 2012 the arbitration panel issued an interim binding award of $5.2 million in favor of WCCE plus interest, reserving the issue of attorney fees and costs. On May 25, 2012 the panel issued its final binding arbitration award, reducing the basic award to $4.82 million, plus interest from March 10, 2011, attorney fees in the amount of $114,240 and costs of $88,527.39.

In their award, which largely agreed with the position advanced by WCCE, the arbitrators explained the Patels had consistently contended the inverse condemnation/ nuisance lawsuit was worth between $15 and $17 million, a position they supported with verified discovery responses in the litigation identifying past and future lost income, loss of goodwill and physical damage to the hotel property and emotional distress damages in the nuisance part of the litigation. In addition, the total value of the purchase/settlement agreement with Caruso greatly exceeded (by a factor of three) the fair market value of the hotel as reflected in the various appraisals obtained during the litigation. Accordingly,

arbitrator; the Patels and WCCE each struck one of the three; and Judge Collins remained as the panel's presiding member.

8

the arbitrators found the total consideration paid was necessarily the direct result of WCCE's efforts in the inverse condemnation litigation. However, the arbitrators concluded the "gross recovery" subject to the 40 percent contingency fee should not include the fair market value of the hotel: "To include the value of the Hotel as part of [the Patels'] 'gross recovery' would ignore the full consideration that [the Patels] contributed to the settlement—i.e., title to the Hotel *and* dismissal of their inverse [condemnation] lawsuit, and would result in a windfall to WCCE."[7] As a result, they reduced the total value Caruso paid to the Patels by $5.2 million to determine the "gross recovery obtained as a result of WCCE's efforts in its representation of the Patels."[8]

5. *Post-arbitration disclosures regarding Kaufman Dolowich Voluck & Gonzo, LLP*

Although Peter Ezzell, cocounsel for WCCE with David Casselman, was identified on WCCE's July 6, 2011 arbitration complaint simply as a member of Law Offices of Peter Q. Ezzell APC with a business address in Marina del Rey, as of June 2011 and throughout the arbitration proceedings Ezzell was also "of counsel" to the law firm of Kaufman Dolowich Voluck & Gonzo, LLP (the Kaufman firm).[9] The Kaufman firm was not identified as counsel of record for WCCE, and Ezzell's of-counsel relationship to the firm was not disclosed to ADR Services, any of the three arbitrators or the Patels. Consequently, the arbitrators' disclosure statements, provided to the parties and their counsel in late July 2011, did not include any information concerning arbitrations, mediations or discovery matters involving the Kaufman firm in which the arbitrators had served as neutrals.

---

[7] While not as current as the other two appraisals (one for $4.9 million; the other for $3.9 million), the arbitrators found the $5.2 million the Patels had paid for the hotel property in 2002 was the best evidence of its value at the time of the settlement in 2011.

[8] The panel also offset the award by the $200,000 the Patels had already paid WCCE.

[9] The Kaufman firm's Los Angeles offices are located on Wilshire Boulevard in West Los Angeles.

After the arbitrators issued their March 22, 2012 interim award, the Patels hired new counsel, Jeffrey Huron, to review the arbitration proceedings. Huron was apparently aware of Ezzell's relationship with the Kaufman firm; on May 4, 2012 he served a deposition subpoena for production of business records on ADR Services seeking all documents from 2006 through the present date reflecting any participation or service by Judges Collins, Hilberman or Romero as an arbitrator or mediator in a matter in which the Kaufman firm or the law firm of Haight Brown & Bonesteel (Ezzell's prior law firm) had been involved.[10] The date scheduled for production was May 24, 2012.

In a letter dated May 31, 2012, apparently sent in response to a meet-and-confer letter from Huron's firm, ADR Services informally provided certain information requested in the subpoena.[11] The letter explained the Kaufman firm (and Ezzell's prior law firm, Haight, Brown & Bonesteel) were not listed as a party or lawyer for any party in the WCCE-Patel arbitration and "ADR Services, Inc. was not aware that Mr. Peter Ezzell was 'associated' with [the Kaufman firm] until we received your subpoena on May 4, 2012. None of the parties and/or attorneys informed us of this fact and the official California State Bar records do not list Mr. Ez[z]ell as being associated with [the Kaufman firm]."

The ADR Services letter disclosed that Judge Collins was serving as a neutral in one arbitration involving the Kaufman firm as counsel that had commenced many months after the initiation of the Patel-WCCE arbitration; Judge Hilberman had completed one mediation as a neutral in a matter in which the Kaufman firm served as counsel prior to the initiation of the Patel-WCCE arbitration and another such mediation during the pendency of the Patel-WCCE arbitration; and Judge Romero had participated as a neutral

---

[10] The business record subpoena also sought documents reflecting participation by the arbitrators in any matters involving WCCE or David Casselman. The subpoena did not state that Ezzell had an of counsel relationship with the Kaufman firm or had been a partner in Haight Brown & Bonesteel.

[11] An earlier, more preliminary response had been sent on May 15, 2012.

10

in four mediations in which the Kaufman firm served as counsel prior to the initiation of the Patel-WCCE arbitration and six additional mediations during the Patel-WCCE arbitration. A more formal response to the subpoena was given on June 6 and June 7, 2012: ADR Services provided a declaration from its president, Lucie Barron, as custodian of records and documents evidencing the mediations and arbitrations involving the Kaufman firm described in the May 31, 2012 letter.

6. *Proceedings in the Superior Court*

WCCE petitioned the superior court to confirm the arbitration award; the Patels filed a combined petition to vacate the award and response to WCCE's petition. The Patels' principal argument was that the award must be vacated because the arbitrators had failed to make mandatory disclosures regarding the Kaufman firm. The Patels also asserted the fee agreement as interpreted by the arbitrators violated public policy by granting WCCE an interest in the Golden Key Hotel without complying with the requirements for obtaining such an interest as set forth in rule 3-300 of the Rules of Professional Conduct (rule 3-300).[12]

On August 3, 2012 the court granted WCCE's petition to confirm the arbitration award and denied the Patels' motion to vacate the award. The court found the arbitrators were not aware of a nexus between Ezzell and the Kaufman firm until May 2012 after issuance of the binding arbitration award and additionally found Ezzell at all times represented WCCE through his professional corporation, not through any association with the Kaufman firm. Accordingly, the court concluded the Patels had not established the arbitrators' failure to disclose their participation in prior (or scheduled future) mediations/arbitrations with the Kaufman firm was a ground for their disqualification or that it was proper to vacate the arbitration award on that basis.

The court also rejected the Patels' public policy argument, noting it had been presented to and denied by the arbitrators. Evaluating the claim itself in terms of

---

[12] The Patels advanced several additional grounds for vacating the arbitration award that were rejected by the superior and have been abandoned on appeal.

11

unconscionability, the court found there had been no procedural unconscionability in the manner in which the fee agreement was negotiated and, although not as "clear cut," no substantive unconscionability: "Considered in isolation, the contingent fee providing for 40% of the hotel sales price does, in this court's estimation, approach the outer limits of an acceptable contingent fee. However, it is not substantively unconscionable. No firm other than WCCE would undertake the representation of the Patels in a lawsuit instigated by substantial nuisance activity that was driving away business from the Patels' hotel. No firm would undertake the representation on an hourly basis, nor on contingent fee terms better than those fairly negotiated with WCCE."

Judgment confirming the arbitration award in favor of WCCE was entered on August 24, 2012. The Patels filed a timely notice of appeal.

## DISCUSSION

1. *Grounds for Vacating an Arbitration Award and Standard of Review*

As the Supreme Court and Courts of Appeal have repeatedly held, when parties agree to private arbitration, the scope of judicial review is strictly limited to give effect to the parties' intent to bypass the judicial system and thereby avoid potential delays at the trial and appellate levels. (E.g., *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 10; *Gray v. Chiu* (2013) 212 Cal.App.4th 1355, 1362.) Generally, a court may not review the merits of the controversy between the parties, the validity of the arbitrators' reasoning or the sufficiency of the evidence supporting the arbitration award. (*Moncharsh*, at p. 10.) "'[I]t is within the power of the arbitrator to make a mistake either legally or factually. When parties opt for the forum of arbitration they agree to be bound by the decision of that forum knowing that arbitrators, like judges, are fallible.'" (*Id.* at p. 12; accord, *Cable Connection, Inc. v. DIRECTV, Inc.* (2008) 44 Cal.4th 1334, 1340 ["the California Legislature 'adopt[ed] the position taken in case law . . . that is, "that in the absence of some limiting clause in the arbitration agreement, the merits of the award, either on questions of fact or of law, may not be reviewed except as provided in the statute"'"].)

12

Judicial review of an arbitration award is limited to "circumstances involving serious problems with the award itself, or with the fairness of the arbitration process." (*Moncharsh v. Heily & Blase*, *supra*, 3 Cal.4th at p. 12.) The only grounds on which a court may vacate an award are enumerated in Code of Civil Procedure section 1286.2, which include, in subdivision (a)(4), the arbitrator exceeded his or her power (for example, by violating an explicit legislative expression of public policy) and in subdivision (a)(6)(A), the arbitrator's failure to timely disclose a ground for disqualification of which the arbitrator was then aware.[13] (See *Cable Connection v. DIRECTV*, *Inc, supra*, 44 Cal.4th at p. 1344 ["courts are authorized to vacate an award if it was (1) procured by corruption, fraud, or undue means; (2) issued by corrupt arbitrators; (3) affected by prejudicial misconduct on the part of the arbitrators; or (4) in excess of the arbitrators' powers"].)

We review de novo a trial court's order confirming an arbitration award, including a determination whether the arbitrator failed to make required disclosures (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 385-387; *Gray v. Chiu, supra,* 212 Cal.App.4th at

---

[13] Code of Civil Procedure section 1286.2, subdivision (a), provides, "[T]he court shall vacate the award if the court determines any of the following: [¶] (1) The award was procured by corruption, fraud or other undue means. [¶] (2) There was corruption in any of the arbitrators. [¶] (3) The rights of the party were substantially prejudiced by misconduct of a neutral arbitrator. [¶] (4) The arbitrators exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted. [¶] (5) The rights of the party were substantially prejudiced by the refusal of the arbitrators to postpone the hearing upon sufficient cause being shown therefor or by the refusal of the arbitrators to hear evidence material to the controversy or by other conduct of the arbitrators contrary to the provisions of this title. [¶] (6) An arbitrator making the award either: (A) failed to disclose within the time required for disclosure a ground for disqualification of which the arbitrator was then aware; or (B) was subject to disqualification upon grounds specified in Section 1281.91 but failed upon receipt of timely demand to disqualify himself or herself as required by that provision. However, this subdivision does not apply to arbitration proceedings conducted under a collective bargaining agreement between employers and employees or between their respective representatives."

Statutory references are to the Code of Civil Procedure.

13

p. 1362) and whether the arbitrator exceeded his or her powers in granting relief (*Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362, 376, fn. 2; *Malek v. Blue Cross of California* (2004) 121 Cal.App.4th 44, 55). However, to the extent the superior court's decision to grant the petition to confirm and deny the petition to vacate the award rests on its determination of disputed factual issues, we review the court's orders under the substantial evidence standard. (*Toal v. Tardif* (2009) 178 Cal.App.4th 1208, 1217; *Malek,* at pp. 55-56; cf. *Haworth*, at pp. 382-383.)

    2. *The Disclosure and Disqualification Provisions of the California Arbitration Act and the Ethics Standards for Neutral Arbitrators*

In *Mahnke v. Superior Court* (2009) 180 Cal.App.4th 565, 573 (*Mahnke*) we observed, "Courts have long struggled with the problem of ensuring not only the neutrality but also the perception of neutrality of arbitrators, who wield tremendous power to decide cases and whose actions lack, for the most part, substantive judicial review." To address this problem, since 1994 section 1281.9, part of the California Arbitration Act (Arbitration Act) (§ 1280 et seq.),[14] has required a proposed neutral arbitrator to disclose various matters relating to his or her ability to be impartial, specifically including information regarding prior or pending cases in which he or she served as either a party or neutral arbitrator that involved any party to the current arbitration or one of the lawyers for a party. (§ 1281.9, subd. (a)(3) [service as party arbitrator], (a)(4) [service as neutral arbitrator]; see also former § 1281.9, subd. (a)(1) & (2), Stats. 1994, ch. 1202, § 1, p. 7420; see generally § 1281.9, subd. (a) ["when a person is to serve as a neutral arbitrator, the proposed neutral arbitrator shall disclose all matters that could cause a person aware of the facts to reasonably entertain a doubt that the proposed neutral arbitrator would be able to be impartial"].)

---

[14]     The Arbitration Act "'represents a comprehensive statutory scheme regulating private arbitration in this state.' [Citation.] The statutory scheme reflects a 'strong public policy in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution.'" (*Haworth v. Superior Court, supra*, 50 Cal.4th at p. 380.)

As part of a revision of section 1281.9 in 2001, the Legislature added current subdivision (a)(2), which requires disclosure by proposed neutral arbitrators of "[a]ny matters required to be disclosed by the ethics standards for neutral arbitrators adopted by the Judicial Council" (Stats. 2001, ch. 362, § 5, pp. 3491-3492) and, at the same time, enacted section 1281.85, which directed the Judicial Council to adopt ethical standards for all neutral arbitrators—standards that were specifically to "address the disclosure of interests, relationships, or affiliations that may constitute conflicts of interest, including prior service as an arbitrator or other dispute resolution neutral entity, disqualifications, acceptance of gifts, and establishment of future professional relationships." (Stats. 2001, ch. 362, § 4, pp. 3490-3491.) Now incorporated into the California Rules of Court, the Ethics Standards for Neutral Arbitrators in Contractual Arbitration (Ethics Standards) "establish the minimum standards of conduct for neutral arbitrators who are subject to these standards. They are intended to guide the conduct of arbitrators, to inform and protect participants in arbitration, and to promote public confidence in the arbitration process." (Ethics Std. 1(a).)

As relevant to the case at bar, Ethics Standard 7(d)(4) requires a person nominated or appointed as a neutral arbitrator to disclose service within the preceding five years as a neutral arbitrator or party-appointed arbitrator in another prior or pending noncollective bargaining case involving a party to the current arbitration or a lawyer for a party, and Ethics Standard 7(d)(5) requires similar disclosure of service within the preceding two years as a dispute resolution neutral other than as an arbitrator (for example, as a mediator). Disclosure of all matters "of which the arbitrator is then aware" must be made in writing within 10 days of service of notice of the proposed nomination or appointment." (*Id.*, 7(c).) The proposed neutral arbitrator is obligated to "make a reasonable effort to inform himself or herself of matters that must be disclosed . . . ." (*Id.,* 9(a).) The duty to disclose these matters is a continuing one. (*Id.,* 7(f); *Gray v. Chiu, supra*, 212 Cal.App.4th at p. 1363.) "If an arbitrator subsequently becomes aware of a matter that must be disclosed . . . , the arbitrator must disclose that matter to the

15

parties in writing within 10 calendar days after the arbitrator becomes aware of the matter." (Ethics Std. 7(c).) "Lawyer for a party" is defined to include "any lawyer or law firm currently associated in the practice of law with the lawyer hired to represent a party." (§ 1281.9, subd. (c); see Ethics Std. 2(m) [same definition].)

Ethics Standard 12 prohibits a neutral arbitrator from entertaining or accepting any offer to serve as a dispute resolution neutral in another case from a party or a lawyer for a party in the pending arbitration from the time of appointment until the conclusion of the arbitration unless the proposed arbitrator discloses within 10 days of service of notice of his or her proposed nomination or appointment that such offers will be entertained and accepted. (Ethics Std. 12(b) & (c).) However, if an arbitrator has made the disclosure described in Ethics Standard 12(b), the arbitrator is not required to disclose when he or she subsequently receives or accepts such an offer. (*Id*., 7(b)(2).)

The parties have an opportunity to disqualify the proposed neutral arbitrator based on the disclosures made. (§ 1281.91, subds. (b), (d); see *Haworth v. Superior Court*, *supra,* 50 Cal.4th at p. 381.) In addition, a proposed neutral arbitrator shall be disqualified if he or she fails to comply with the section 1281.9 disclosure requirements (which, as discussed, incorporate the Ethics Standards' requirements in section 1291.9, subdivision (a)(2)). (§ 1281.91, subd. (a).) "If an arbitrator 'failed to disclose within the time required for disclosure a ground for disqualification of which the arbitrator was then aware,' the trial court must vacate the arbitration award. (§ 1286.2, subd. (a)(6)(A).)" (*Haworth*, at p. 381; accord, *Gray v. Chiu, supra*, 212 Cal.App.4th at p. 1366; *International Alliance of Theatrical State Employees, Etc. v. Laughon* (2004) 118 Cal.App.4th 1380, 1393.)

The rules for party arbitrators differ from those for neutral arbitrators. The Arbitration Act defines a "neutral arbitrator" as one "who is (1) selected jointly by the parties or by the arbitrators selected by the parties or (2) appointed by the court when the parties or the arbitrators selected by the parties fail to select an arbitrator who was to be selected jointly by them." (§ 1280, subd. (d); see *Haworth v. Superior Court, supra*,

16

50 Cal.4th at p. 381, fn. 4.) Ethics Standard 2(a)(1) contains a similar definition: "'Arbitrator' and 'neutral arbitrator' [as used in these standards] mean any arbitrator who is subject to these standards and who is to serve impartially, whether selected or appointed: [¶] (A) Jointly by the parties or by the arbitrators selected by the parties; [¶] (B) By the court, when the parties or the arbitrators selected by the parties fail to select an arbitrator who was to be selected jointly by them; or [¶] (C) By a dispute resolution provider organization under an agreement of the parties." A "[p]arty-arbitrator," in contrast, is "an arbitrator selected unilaterally by a party." (Ethics Std. 2(q).)

Neither section 1281.9 nor the Ethics Standards' requirements apply to party arbitrators. (*Jevne v. Superior Court* (2005) 35 Cal.4th 935, 945, fn. 4 [the Ethics Standards do not apply to party arbitrators]; *Mahnke, supra*, 180 Cal.App.4th at p. 577 ["[t]he disclosure requirements in section 1289 and the Judicial Council's ethics standards for neutral arbitrators do not apply to any arbitrator other than the jointly selected, or court-appointed, proposed neutral arbitrator"]; *Jakks Pacific, Inc. v. Superior Court* (2008) 160 Cal.App.4th 596, 605 ["[t]he Standards apply only to neutral arbitrators selected by the parties or a dispute resolution services provider, or appointed by the court to serve impartially [citation], and do not apply to party arbitrators [citation]"]; Ethics Std. 3(b).) For party arbitrators, disclosure and disqualification are governed by an objective standard: Matters must be disclosed and may be the basis for disqualification if they would create an impression of bias or cause a person aware of all the facts to reasonably entertain a doubt as to the ability of the party arbitrator to be impartial. (See *Mahnke*, at p. 579; *Betz v. Pankow* (1995) 31 Cal.App.4th 1503, 1508-1509; see generally *Commonwealth Coatings Corp. v. Continental Casualty Co.* (1968) 393 U.S. 145, 149 [89 S.Ct. 337, 21 L.Ed.2d 301] ["[w]e can perceive no way in which the effectiveness of the arbitration process will be hampered by the simple requirement that arbitrators disclose to the parties any dealing that might create an impression of possible bias"].) "[U]nless 'a reasonable member of the public at large, aware of all the facts, would fairly entertain doubts concerning the [arbitrator's] impartiality . . . ,' the arbitrator

17

is not subject to disqualification.  [Citations.]  Moreover, '[p]otential bias and prejudice must clearly be established by an objective standard.  [Citation.]  "Courts must apply with restraint statutes authorizing disqualification of [an arbitrator] due to bias."'" (*Mahnke,* at p. 579.)  "There is a presumption favoring the validity of the award, and [the party challenging the award] bears the burden of establishing [a] claim of invalidity."  (*Betz v. Pankow* (1993) 16 Cal.App.4th 919, 923.)

3. *The Arbitrators' Failure To Disclose Their Previous Service as Neutrals in Cases Involving the Kaufman Firm Does Not Require Vacating the Arbitration Award*

The Patels charge "the arbitrators had a total of 14 undisclosed mediations and arbitrations with the Kaufman firm."  However, nine of those 14 matters were initiated while the WCCE-Patel arbitration was pending.  Because all three arbitrators advised the parties in writing they would entertain and accept offers to serve as a dispute resolution neutral in another case from the parties or a lawyer for a party, Ethics Standard 7(b)(2) expressly excludes those matters from any disclosure requirement.[15]  Accordingly, the Patels' challenge to the arbitration award on this ground rests only on Judge Hilberman's failure to disclose he had served as a neutral in one prior mediation in which the Kaufman firm was involved as counsel and Judge Romero's failure to disclose he had served as a neutral in four mediations involving the Kaufman firm.  There can be no issue at all with respect to disclosures by Judge Collins, who had not participated as a dispute resolution

---

[15] In a footnote in their reply brief, but not elsewhere in their briefs, the Patels challenge the applicability of Ethics Standard 7(b)(2), asserting the failure to identify past relationships with the Kaufman firm made the arbitrators' statements they intended to entertain and accept offers to serve as a neutral in future cases involving a party or a lawyer for a party ineffective as to that firm because it "lacked context."  However, if the Kaufman firm is necessarily included in the phrase "a lawyer for a party" for mandatory disclosure purposes under Ethics Standard 7(d) by virtue of Ezzell's of-counsel relationship, we fail to see why the disclosure under Ethics Standard 12 that the arbitrators will entertain and may accept offers for future service as a neutral for "a lawyer for a party" does not sweep equally broadly.

18

neutral in any matters involving the Kaufman firm prior to the initiation of the WCCE-Patel arbitration.

The Patels contend disclosure of the five mediations was required by section 1281.9 and Ethics Standard 7 and the failure to timely disclose that information requires the arbitration award be vacated under section 1286.2, subdivision (a)(6)(A), whether or not those facts could reasonably cause a person to doubt the arbitrators' impartiality. Their argument suffers from multiple flaws.

a. *Ezzell was associated in the practice of law with the Kaufman firm for purposes of section 1281.9 and Ethics Standard 7*

Based on evidence presented in connection with the Patels' motion to vacate the arbitration award, the superior court found Ezzell began his representation of WCCE in this fee dispute many months before he associated part of his professional work in an of-counsel capacity with the Kaufman firm; WCCE retained Ezzell, not the Kaufman firm, to represent it; and Ezzell, in fact, represented WCCE through his professional corporation, not through his association with the Kaufman firm. These findings, although contested by the Patels, are supported by substantial evidence.[16] Nonetheless, as the Patels contend, they are not germane to the disclosure issue. Prior to the initiation of the arbitration itself, when the proposed arbitrators were being selected, Ezzell had an of-counsel relationship with the Kaufman firm; and the firm was, therefore, "associated in the practice of law with the lawyer hired to represent a party in the arbitration." Certainly, if a proposed neutral arbitrator knew of this relationship between Ezzell and the Kaufman firm, under section 1281.9 and Ethics Standard 7 he or she was obligated to disclose prior service as a neutral in matters in which the Kaufman firm was involved within the relevant time period (five years for arbitrations and two years for mediations).

---

[16] For example, the declaration of Frances O'Meara, then the managing partner of the Kaufman firm, stated all legal work on the WCCE-Patel arbitration was handled exclusively through Ezzell's professional corporation: "[A]lthough [Ezzell] worked on [the WCCE-Patel matter], including using our offices, equipment and billing assistance, at no time was the Kaufman, Dolowich firm of record for WCCE in the Patel case."

b. *In light of the superior court's findings regarding the arbitrators' lack of knowledge, disclosure of prior service as a neutral in proceedings involving the Kaufman firm was not required prior to May 2012*

i. *The superior court's findings*

The superior court found the arbitrators were not aware of a nexus between Ezzell and the Kaufman firm until May 2012, "after issuance of the Binding Award." Because the Patels had the burden of establishing the facts supporting their claim the arbitrators failed to make required disclosures, thereby invalidating the arbitration award (see *Betz v. Pankow, supra,* 16 Cal.App.4th at p. 926 ["the burden of proof is on appellant as the party claiming bias to establish facts supporting her position"]), we may reverse that finding only if the evidence compels the contrary finding—that the arbitrators were, in fact, aware Ezzell was of counsel to the Kaufman firm. (See *Sonic Mfg. Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 466 [when "'the issue on appeal turns on a failure of proof [in the trial court], the question for a reviewing court becomes whether the evidence compels a finding in favor of the [moving party] as a matter of law. [Citations.] Specifically, the question becomes whether the [moving party's] evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding"'"]; *Valero v. Board of Retirement of Tulare County Employees' Retirement Assn.* (2012) 205 Cal.App.4th 960, 965-966 [same].) The evidence submitted on the Patels' petition falls well short of that mark.

In his declaration in opposition to the petition to vacate the arbitration award, David Casselman stated he had negotiated with Ezzell to represent WCCE through his own professional capacity. According to Casselman, Ezzell's address with the California State Bar was listed as Law Offices of Peter Q. Ezzell, "which is how arbitrators at ADR [Services] and elsewhere check and make their disclosures." Casselman also testified Ezzell was identified through his professional corporation, not the Kaufman firm, "on the proof of service of every pleading to my knowledge." Casselman acknowledged Ezzell's address was listed at the Kaufman firm on the face page of several pleadings or briefs

20

filed with the arbitrators, but explained they were "inadvertent and clearly erroneous" and insisted, "[N]o such erroneous references were made at any time before disclosures by the arbitrators were required and made." In his declaration Ezzell confirmed he had maintained his Marina Del Rey office with the State Bar, not the Kaufman firm's offices. In Ezzell's opinion, the arbitrators would not have any "reason to suspect that the Kaufman firm was somehow involved, through me, when my appearance was always through my own Professional Corporation." Finally, as discussed, in its May 31, 2012 letter informally responding to the Patels' subpoena, which was submitted as an exhibit in support of the petition to vacate arbitration award, ADR Services explained the Kaufman firm had not been listed as a party or a lawyer for a party in the materials submitted in connection with the initiation of the arbitration and selection of arbitrators, and stated, "ADR Services, Inc. was not aware that Mr. Ezzell was 'associated' with [the Kaufman firm] until we received your subpoena on May 4, 2012. None of the parties and/or attorneys informed us of this fact and the official State Bar records do not list Mr. Ez[z]ell as being associated with [the Kaufman firm]."

In their own petition to vacate the Patels implicitly conceded, because neither Ezzell nor WCCE had disclosed Ezzell's of-counsel relationship with the Kaufman firm, the arbitrators were unaware of it. Thus, they asserted, "WCCE's failure to identify the Kaufman firm as its counsel prevented retired Judges Romero and Hilberman from timely disclosing their service in 4 prior mediations involving the Kaufman firm" and insisted "WCCE alone—not the arbitrators, not the Patels, not their lawyers, no one else—is responsible for the missteps that fatally marred the arbitration proceedings." Indeed, misapprehending their burden in seeking to vacate an arbitration award, they specifically argued, "the Patels need not show that the arbitrators knew that Mr. Ezzell practiced at the Kaufman Firm."

In its written ruling granting the petition to confirm and denying the petition to vacate the arbitration award, the superior court commented that the Patels had "offer[ed] no evidence that the arbitrators knew or, based upon the information before them

21

showing Ezzell's law firm as his professional corporation, should have known that Ezzell was associated with the Kaufman firm." That is, perhaps, an overstatement. The Patels did present some evidence that, perhaps, might have supported a finding the arbitrators were aware, or should have been aware, of Ezzell's relationship with the Kaufman firm prior to May 2012—specifically, the occasional listing of Ezzell's address as the Kaufman firm at its Wilshire Boulevard address on the face sheet of papers filed in the arbitration proceeding and a press release announcing Ezzell's of-counsel relationship with the Kaufman firm several months prior to the commencement of the arbitration. But the court was not obligated to credit that evidence; and, standing alone, it is woefully insufficient to compel a finding as a matter of law that the arbitrators were aware of a professional relationship between Ezzell and the Kaufman firm prior to May 2012.

ii. *Only nondisclosure of facts then known to the arbitrators supports an order vacating an arbitration award*

A proposed neutral arbitrator's disclosure obligations are limited to specific matters "of which the arbitrator is then aware" (Ethics Std. 7(c)) and matters of which he or she "subsequently becomes aware." (*Ibid.*; see Ethics Std. 7(f) [arbitrator's duty to disclose is a continuing one].) In light of the superior court's findings that none of the arbitrators was aware of Ezzell's relationship to the Kaufman firm and did not subsequently become aware of that relationship prior to issuance of the binding award, the court properly denied the petition to vacate the arbitration award on this basis. As discussed, section 1286.2, subdivision (a), which authorizes the court to vacate an arbitration award in carefully delimited situations, permits vacatur only if the arbitrator "failed to disclose within the time required for disclosure a ground for disqualification *of which the arbitrator was then aware*." (§ 1286.2, subd. (a)(6)(A), italics added; see *Haworth v. Superior Court, supra,* 50 Cal.4th at pp. 381, 386 ["[i]n ruling on a petition to vacate an arbitration award, the superior court is itself reviewing a decision by the arbitrator not to disclose, based upon the facts known to the arbitrator at the time required for disclosure"].) "[T]his requirement of scienter is a deliberate expression of the Legislature's intent to prevent the undoing of an arbitration award based upon an

arbitrator's unknowing failure to disclose information." (*Casden Park La Brea Retail, LLC v. Ross Dress for Less, Inc.* (2008) 162 Cal.App.4th 468, 477; *Betz v. Pankow, supra,* 31 Cal.App.4th 1511-1512 [an arbitrator "cannot be faulted for failing to disclose facts of which he was unaware"].)

To be sure, Judges Hilberman and Romero presumably knew they had served as mediators in matters in which the Kaufman firm (although not Ezzell) had been involved. But, contrary to the Patels' argument, that information, standing alone, did not constitute "a ground for disqualification of which the arbitrator was then aware." Absent any awareness that the Kaufman firm was associated in the practice of law with Ezzell, the arbitrators could not be charged with knowledge of a ground for disqualification. Consequently, their failure to disclose that information falls outside the narrow scope of section 1286.2, subdivision (a)(6)(A).

   c. *The Patels have forfeited the issue of the timeliness of the arbitrators' post-subpoena disclosures*

The Patels correctly observe, under Ethics Standard 7(c) and (f), the fact Ezzell's relationship with the Kaufman firm was not initially known did not relieve the arbitrators of their disclosure obligations under the Ethics Standards[17] once they learned of that relationship: A neutral arbitrator's duty of disclosure is a continuing one, "applying from service of the notice of the arbitrator's proposed nomination or appointment until the conclusion of the arbitration proceeding." (Ethics Std. 7(f); see *Gray v. Chiu, supra*, 212 Cal.App.4th at p. 1363.) Relying on that principle, the Patels now argue the May 31, 2012 disclosure of Judges Hilberman and Romero's participation as mediators in matters involving the Kaufman firm was not timely because it occurred more than 10 days after service of the subpoena on ADR Services on May 4, 2012.

---

[17] As discussed in the following section, however, only Judge Collins was a neutral arbitrator subject to the mandatory disclosure requirements of section 1281.9 and the Ethics Standards.

This ground for vacating the arbitration award was not presented by the Patels to the superior court. Their petition to vacate the award, supporting papers, reply brief and oral argument all addressed only the *failure* to disclose any service as a neutral in proceedings involving the Kaufman firm, not the purportedly untimely nature of the May 31, 2012 disclosures. The 10-day rule for disclosure of subsequently acquired information was addressed by the Patels in the superior court only in the context of the arbitrators' appointment as neutrals in new matters while the WCCE-Patel matter was pending (see fn. 15, above), not in relation to the May 31, 2012 disclosures. Similarly, although the timing of the disclosures themselves was mentioned at oral argument, it was not challenged as a violation of Ethics Standard 7(c) and (d), but rather proffered as an explanation as to why no motion to disqualify the arbitrators had been made by the Patels.[18] Having failed to raise the issue in the superior court, it has been forfeited on appeal. (*Cable Connection, Inc. v. DIRECTV, Inc., supra*, 44 Cal.4th at p. 1351, fn. 12 [the rule is well settled that a party is not permitted to adopt a new and different theory on appeal]; *Johnson v. Greenelesh* (2009) 47 Cal.4th 598, 603 [issues not raised in the trial court cannot be raised for the first time on appeal]; see *Delaney v. Dahl* (2002) 99 Cal.App.4th 647, 660 [argument forfeited on appeal because not raised in petition to vacate arbitration award].)

The Patels suggest their argument the May 31, 2012 disclosures were themselves untimely presents a question of law based on undisputed facts and, therefore, may be considered even though raised for the first time on appeal. (See, e.g., *Sea & Sage*

---

[18] Counsel for the Patels argued, "I would like the court to look at Exhibit 28, which is the [May 31, 2012] letter from ADR [Services] and [counsel for WCCE] is, I think incorrectly characterizing this as a disclosure. It is not a disclosure. It's a meet and confer letter in response to a subpoena that my office served on ADR [Services] to get the information concerning the matters in which the arbitrators participated in with the Kaufman firm. Furthermore, if the court looks at the date of this letter, this is May the 31st of 2012. And the date of the final arbitration award is May the 25th of 2012. So, first of all, there was not any—this is not a disclosure. Second of all, there was no way that we could have moved to disqualify the arbitrator because the final award had been entered. . . ."

24

*Audubon Society, Inc. v. Planning Com*. (1983) 34 Cal.3d 412, 417.) But the Patels' claim plainly involves at least one factual question—did the arbitrators first learn of Ezzell's relationship with the Kaufman firm on May 4, 2012 when their subpoena was served on ADR Services, as the Patels contend?[19] The subpoena does not identify the relationship between Ezzell and the Kaufman firm; it merely asks for records regarding the arbitrators' prior service as neutrals in cases in which the firm was involved. In addition, the subpoena itself was not served on the arbitrators, but on ADR Services. When Judges Collins, Hilberman and Romero first actually learned about it has never been addressed. Indeed, the superior court only found the arbitrators were not aware of the nexus between Ezzell and the Kaufman firm "until May 2012." When in May, however, is the crucial question for purposes of the 10-day disclosure rule. Because the issue was not previously raised, the record is devoid of evidence necessary to resolve this claim. We cannot decide it for the first time on appeal.

        d.  *Judge Hilberman and Judge Romero were serving as party arbitrators, not neutrals, and, as such, were not bound by the disclosure requirements of section 1281.9 and Ethics Standard 7*

Even were we to accept the Patels' premise that Judge Hilberman and Judge Romero violated Ethics Standard 7 by failing in a timely manner to make mandatory disclosures regarding their prior service as neutrals in matters involving the Kaufman firm—either upon their appointment or during the pendency of the arbitration proceedings—such nondisclosure would not be a ground for vacating the arbitration award under section 1286.2, subdivision (a)(6)(A). As discussed, the specific disclosure requirements of Ethics Standard 7 apply only to proposed neutral arbitrators. Yet neither Judge Hilberman nor Judge Romero was selected "jointly by the parties"; thus, neither

---

[19] Whether by setting the response date for the subpoena for May 24, 2012, 20 days after service, and then participating in a meet-and-confer process that extended that date constituted a waiver by the Patels of the usual 10-day disclosure rule may also involve factual issues.

25

was a neutral arbitrator within the meaning of the Arbitration Act or the Ethics Standards.[20]

Under the selection procedure adopted by the parties following their fee dispute, after each party unilaterally selected two potential arbitrators, the adverse party had the right to deselect one of the two names submitted. The arbitrator remaining after each side's deselection—Judge Romero for the Patels and Judge Hilberman for WCCE—was selected unilaterally by the side that put his name forward. Accordingly, both arbitrators are party selected; and neither is subject to the mandatory disclosure requirements of section 1281.9 and the Ethics Standards. (See *Jevne v. Superior Court, supra,* 35 Cal.4th at p. 945, fn. 4; *Jakks Pacific, Inc. v. Superior Court, supra,* 160 Cal.App.4th at p. 605.) Rather, issues of disclosure and the ultimate question of vacating the arbitration award under section 1286.2 for failure to timely disclose a ground for disqualification require a showing that a reasonable person would doubt the arbitrators' impartiality if he or she knew the undisclosed information. (See *Casden Park La Brea Retail LLC v. Ross Dress for Less, Inc., supra*, 162 Cal.App.4th at p. 478; *Mahnke, supra*, 180 Cal.App.4th at pp. 579-580.)

In their supplemental letter brief the Patels contend WCCE has waived any contention Judge Hilberman and Judge Romero were not subject to the disclosure requirements of section 1281.9 and the Ethics Standards because it failed to make that argument either in the superior court or in its respondent's brief in this court. The issue here, however, is not whether a party has properly presented an argument for decision by the trial or appellate court—the question just addressed with respect to the Patels' contention the May 31, 2012 disclosures were untimely. The Patels petitioned to vacate the arbitration award on the ground legally required disclosures were not made by the arbitrators. We cannot evaluate the merits of that claim without first determining the

---

[20] Because this issue was not raised by either party, we requested supplemental briefing to address whether Judge Hilberman and Judge Romero were party selected or neutral arbitrators and the applicability of the disclosure requirements in section 1281.9 and the Ethics Standards under the somewhat unusual circumstances of this case.

26

governing legal standard: What, if any, disclosures were the three arbitrators required to make under section 1281.9 and the Ethics Standards? Our analysis may be helped by briefing from the party seeking to confirm the arbitration award, but it is not dependent on it. Whether WCCE failed to discuss the applicable legal standard at all or asserted an incorrect standard applied, our task is to determine and apply the proper one. (See *Mansouri v. Superior Court* (2010) 181 Cal.App.4th 633, 639 [doctrine of forfeiture not applicable "where the error is too fundamental to be ignored"]; cf. *Smith v. Smith* (2012) 208 Cal.App.4th 1074, 1078 [appellant bears affirmative burden to show error whether or not respondent has filed a brief]; *Nakamura v. Parker* (2007) 156 Cal.App.4th 327, 334 [failure to file respondent's brief means appellate court decides appeal on the record, the opening brief and any oral argument by appellant, "reversing only if prejudicial error is shown"]; Cal. Rules of Court, rule 8.220(a)(2).)

Similarly, we attach no legal significance to the fact Judge Hilberman and Judge Romero may have identified themselves as neutral arbitrators. The question is not whether they believed they were obligated to make disclosures in conformity with the Ethics Standards—undoubtedly they did. The issue before us is whether their purported failure to make all the disclosures required by the Ethics Standards is a valid, statutory ground for vacating the arbitration award. For the reasons discussed, it is not.

Finally, measuring the disclosures and nondisclosures in this proceeding against the objective standard applicable to party arbitrators, we have no difficulty concluding, as did the superior court, that the failure to disclose prior service as a neutral in several mediations involving the Kaufman firm under the circumstances here would not cause a reasonable person to doubt the arbitrators' impartiality: Those undisclosed relationships were "'too insubstantial to warrant vacating the award.'" (*Mahnke, supra*, 180 Cal.App.4th at p. 580; see *Casden Park La Brea Retail LLC v. Ross Dress for Less, Inc., supra*, 162 Cal.App.4th at p. 478.) Indeed, the Patels do not seriously contend to the contrary. Rather, relying on *International Alliance of Theatrical State Employees, Etc. v. Laughon, supra,* 118 Cal.App.4th 1380, the Patels argue the Legislature intended the

27

failure to disclose a prior relationship to a party or a lawyer for a party within one of the categories specified in section 1281.9, subdivision (a), or the Judicial Council's Ethics Standards "necessarily satisfies the 'might cause a reasonable person to question' standard." (*International Alliance*, at pp. 1386-1387; see also *id*. at p. 1394 ["the Legislature has already decided that, when a proposed arbitrator had previously served in an arbitration involving parties to the proposed arbitration, an impression of possible bias is created"].)

We prefer *Gray's* articulation of the relationship between the general disclosure requirement and the specific disclosures mandated by section 1281.9, subdivision (a), and Ethics Standard 7: "In addition to compelling the disclosure of all facts that *could* cause a person to entertain such a doubt, section 1281.9 enumerates specific instances where disclosure is always compelled." (*Gray v. Chiu, supra*, 212 Cal.App.4th at p. 1364.) But regardless of phasing, both *International Alliance* and *Gray* concerned vacating an arbitration award based on nondisclosure by neutral arbitrators; the per se rule of section 1281.9 simply has no applicability here as to party arbitrators Hilberman and Romero.

4. *The Arbitration Award Does Not Violate Public Policy*

Rule 3-300 prohibits a lawyer from entering into a business transaction with a client or acquiring a pecuniary interest adverse to the client without satisfying certain requirements to ensure the terms of the arrangement are fair to the client and the client has given his or her informed written consent.[21] An attorney's charging lien to secure payment of hourly fees—a "lien 'upon the fund or judgment which [the attorney] has

---

[21] Rule 3-300, Avoiding Interests Adverse to a Client, provides, "A member shall not enter into a business transaction with a client; or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client, unless each of the following requirements have been satisfied: [¶] (A) The transaction or acquisition and its terms are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which should reasonably have been understood by the client; and [¶] (B) The client is advised in writing that the client may seek the advice of an independent lawyer of the client's choice and is given a reasonable opportunity to seek that advice; and [¶] (C) The client thereafter consents in writing to the terms of the transaction or the terms of the acquisition."

recovered for his [or her] compensation as attorney in recovering the fund or judgment'"—is a security interest in the proceeds of the litigation and, as such, constitutes "an adverse interest within the meaning of rule 3-300 and thus requires the client's informed written consent." (*Fletcher v. Davis* (2004) 33 Cal.4th 61, 66-67, 69.)

Seeking to extend the holding of *Fletcher v. Davis, supra*, 33 Cal.4th 61, the Patels contend their contingency fee agreement with WCCE, as interpreted and enforced by the arbitrators, violated public policy by providing WCCE an interest in the Patels' hotel property (through the retainer agreement's charging lien) without complying with the requirements of rule 3-300 and assert the award must therefore be vacated under section 1286.2, subdivision (a)(4), as exceeding the arbitrators' powers. This argument is predicated on the acknowledgment in *Moncharsh v. Heily & Blase, supra*, 3 Cal.4th at page 31 that "'the rules which give finality to the arbitrator's determination of ordinary questions of fact or of law are inapplicable *where the issue of illegality of the entire transaction* is raised in a proceeding for the enforcement of the arbitrator's award.'" (See also *id*. at p. 32 ["We recognize that there may be some limited and exceptional circumstances justifying judicial review of an arbitrator's decision when a party claims illegality affects only a portion of the underlying contract. Such cases would include those in which granting finality to an arbitrator's decision would be inconsistent with the protection of a party's statutory rights. [Citation.] [¶] Without an explicit legislative expression of public policy, however, courts should be reluctant to invalidate an arbitrator's award on this ground."].)

As reviewed in a recent case by our colleagues in Division Four of this court, *Ahdout v. Hekmatjah* (2013) 213 Cal.App.4th 21, 37, "Numerous courts have since construed *Moncharsh* to stand for the proposition that an arbitrator exceeds its power within the meaning of Code of Civil Procedure section 1286.2 by issuing an award that violates a party's statutory rights or 'an explicit legislative expression of public policy.'" (See, e.g., *D.C. v. Harvard-Westlake School* (2009) 176 Cal.App.4th 836, 866 [attorney fee award to defendant based on prevailing party clause in arbitration contract vacated

29

because underlying statute authorized fees to be awarded only to a prevailing plaintiff; "the one-way provisions are unwaivable statutory rights"]; *Department of Personnel Administration v. California Correctional Peace Officers Assn.* (2007) 152 Cal.App.4th 1193, 1203 [arbitrator exceeded his powers and violated the Dills Act by reforming memorandum of understanding after its terms had been approved by the Legislature]; *Jordan v. Department of Motor Vehicles* (2002) 100 Cal.App.4th 431, 452 [award amounted to unconstitutional gift of public funds in derogation of special statute authorizing arbitration and impliedly limiting amount of award to no more than earlier judgment from which appeal had been dismissed to facilitate arbitration].) However, "[t]his exception is applicable only when there has been '"a clear expression of illegality or public policy"' that undermines the presumption in favor of private arbitration." (*Ahdout*, at p. 38.)

The Patels are correct an agreement between a lawyer and client that fails to comply with the requirements of rule 3-300 will not be enforced by a court. (See, e.g., *BGJ Associates v. Wilson* (2003) 113 Cal.App.4th 1217, 1221; *Fair v. Bakhtiari* (2011) 195 Cal.App.4th 1135, 1163-1168.) But it does not follow an arbitrator's enforcement of such an agreement falls within the illegality or public policy exceptions to the general rule precluding judicial review of the merits of an arbitration award. Indeed, in *Moncharsh* itself, the Supreme Court refused to review an award that allegedly violated the Rules of Professional Conduct regarding fee-splitting arrangements and unconscionability, even if the error was apparent on the face of the award and would cause substantial injustice: "We perceive, however, nothing in the Rules of Professional Conduct at issue in this case that suggests resolution by an arbitrator of what is essentially an ordinary fee dispute would be inappropriate or would improperly protect the public interest. Accordingly, judicial review of the arbitrator's decision is unavailable." (*Moncharsh v. Heily & Blase, supra,* 3 Cal.4th at p. 33.)[22]

---

[22] As with an agreement that violates rule 3-300, a fee splitting contract that does not comply with the requirements for such agreements set forth in the Rules of Professional

The Patels seek to distinguish *Moncharsh* and thereby bring themselves within the limited public policy exception permitting judicial review of the arbitrators' award on two grounds. First, they argue the lawyer in *Moncharsh* had challenged only a single provision of his overall contract with his former law firm while they assert the violation of rule 3-300 voids the entire retainer agreement with WCCE. Although the Court in *Moncharsh* did discuss the difference in terms of reviewability of a claim that an entire contract or transaction was illegal and one where a party claims illegality affects only a portion of the underlying contract (*Moncharsh v. Heily & Blase, supra,* 3 Cal.4th at pp. 31-32), we have difficulty understanding the applicability of that distinction in the present case. As in *Moncharsh*, the Patels argue only one specific provision of the retainer agreement—the definition of "gross recovery" if interpreted to include any profit on the sale of the hotel and coupled with the retainer agreement's attorney lien provision—is "illegal." Although they now assert that illegality voids the entire agreement, the Patels at all times prior to the issuance of the arbitration award accepted the retainer agreement, including the arbitration provision, the 40 percent contingent fee and the related attorney lien, as valid and binding.

Second, they contrast the internecine lawyer-versus-lawyer conflict in *Moncharsh* with the lawyer-versus-client fight here and assert the public interest in protecting a client, rather than another lawyer, against an overreaching attorney is far greater. The premise for this distinction is questionable (see *Chambers v. Kay* (2002) 29 Cal.4th 142, 145 [Supreme Court adopted rules requiring written, informed consent of client to fee sharing arrangements between lawyers "to protect the public and to promote respect and confidence in the legal profession"]), and it finds no support in the case law.

Although we find the Patels' arguments for judicial review of their rule 3-300 argument unpersuasive, we need not rest our decision on that ground; for nothing about the arbitrators' award triggered the requirements of rule 3-300. As the Patels concede, in

Conduct will not be enforced by a court. (See *Huskinson & Brown v. Wolf* (2004) 32 Cal.4th 453, 457; *Chambers v. Kay* (2002) 29 Cal.4th 142.)

31

*Plummer v. Day/Eisenberg, LLP* (2010) 184 Cal.App.4th 38 the Court of Appeal resolved the issue expressly left open by the Supreme Court in *Fletcher v. Davis, supra*, 33 Cal.4th 61[23] and held, "A contingency fee agreement, such as the retention agreement here [and the Patel-WCCE agreement] need not comply with rule 3-300 to create an attorney's lien." (*Plummer,* at pp. 49-50.) This holding was based on a formal opinion from the California State Bar's Standing Committee on Professional Responsibility and Conduct (Formal Opinion No. 2006-170), issued after the *Fletcher* decision, which explained, "'[A] charging lien is an equitable corollary to, and thus inherent in, a *contingency* fee contract because, unlike the situation in *hourly* fee agreements: (a) the attorney and client have agreed that the attorney's fee will be limited to a percentage of, and derived only from, a successful recovery created by the attorney's work; (b) the attorney and client share the risk of recovery; (c) any fee the attorney earns or receives is delayed until the client obtains a recovery, usually at the very end of the representation; and (d) the recovery often represents the only sources of funds from which the attorney can ever by paid. For these reasons, charging liens are not only inherent in contingency fee contracts, they are almost universally found and almost universally uncontroversial in such contracts.'" (*Plummer*, at p. 49.)

Here, the arbitrators, based on their findings concerning the scope of WCCE's work, the fair market value of the Golden Key Hotel and the economic benefit WCCE's legal services generated for the Patels, together with their interpretation of the term "gross recovery" in the retainer agreement, concluded the entire value of the settlement in excess of the hotel's actual value "constitutes [the Patels'] recovery as a direct result of WCCE's efforts in the inverse litigation"—that is, their total recovery in the underlying proceeding. No interest was awarded in the Patels' hotel itself or the sum representing its fair market value. Although the Patels vigorously quarrel with the outcome, neither the

---

[23]    The *Fletcher* Court expressly declined to "decide whether rule 3-300 applies to a contingency-fee arrangement coupled with a lien on the client's prospective recovery in the same proceeding." (*Fletcher v. Davis*, *supra*, 33 Cal.4th at p. 70, fn. 3.)

accuracy of the arbitrators' factual findings nor the propriety of their interpretation of the contract's language, including their implicit conclusion regarding the scope of "this proceeding," is subject to judicial review. In light of those findings and conclusions, the retainer agreement as interpreted and enforced by the arbitrators does not violate rule 3-300.

## DISPOSITION

The judgment is affirmed. Wasserman, Comden, Casselman & Esensten LLP is to recover its costs on appeal.


PERLUSS, P. J.

We concur:


WOODS, J.


ZELON, J.